IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Defenders of Wildlife, et al., | No. CV-14-02446-TUC-RM |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

Pending before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, summary judgment will be granted in favor of Plaintiffs.

*I. Factual Background*

In 2011, Regal Resources USA, Inc. submitted a Plan of Operations to explore seven of its mineral claims in the Humboldt Canyon area of the Patagonia Mountains, within the Coronado National Forest. (SP000575-76; SP001953.)[1] The proposed project, known as the Sunnyside Project, will involve six temporary drill sites to assess copper mineralization. (SP001949; SP002010; SP002041.) A Biological Assessment ("BA") prepared in May 2014 concluded that the project was not likely to adversely affect species listed under the Endangered Species Act ("ESA"), and the United States Fish and Wildlife Service ("USFWS") issued a letter of concurrence on August 11, 2014. (*See* SP001656; SP001658; SP001662; SP001664; SP001666; SP001794-1802.) On September 12, 2014, the United States Forest Service ("USFS") issued a Decision

---

[1] All record citations are to the bates-numbered administrative record.

Memorandum authorizing the Sunnyside Project. (SP001810-1823.)[2]

On October 29, 2014, Plaintiffs Defenders of Wildlife and Patagonia Area Resource Alliance filed a Complaint (Doc. 1) against USFS and USFWS, challenging the agencies' approval of the Sunnyside Project and alleging violations of the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the ESA. On December 6, 2014, due to the recent listing of the yellow-billed cuckoo and due to new information regarding the project's potential effects on ESA-listed species, USFWS re-initiated consultation with USFS under Section 7 of the ESA.

A revised BA was created to address the listing of the yellow-billed cuckoo and to reflect updated project information. (SP001947-2003.) The revised BA found that the Sunnyside Project may affect, but is not likely to adversely affect, the jaguar, the lesser long-nosed bat, the Mexican spotted owl, the ocelot, and the yellow-billed cuckoo; that it may affect, but is not likely to adversely affect, jaguar critical habitat; and that it will not affect Mexican spotted owl critical habitat. (SP001959; SP001961; SP001966-67; SP001969.) On April 2, 2015, USFWS issued a revised letter of concurrence, agreeing with the revised BA's determination that the project is not likely to adversely affect ESA-listed species or critical habitat. (SP002009-2030.) On April 8, 2015, USFS issued a revised Decision Memorandum authorizing the project. (SP002041-2055.)

On May 27, 2015, Plaintiffs filed a Supplemental and Amended Complaint (Doc. 28), listing only USFS as a defendant and alleging violations of NEPA and the APA.[3] Plaintiffs seek a declaratory judgment that USFS violated NEPA and the APA in approving the Sunnyside Project, as well as an order vacating and setting aside USFS's revised Decision Memorandum authorizing the Project. (Doc. 28 at ¶ 12.)

The Sunnyside Project will involve road maintenance, drill site preparation,

---

[2] The USFS published an initial Decision Memorandum approving the project on August 25, 2014. It published a second Decision Memorandum approving the project on September 12, 2014. (Doc. 28 at ¶¶ 59-60.)

[3] Plaintiffs are no longer asserting any claims against USFWS and are no longer alleging violations of the ESA.

drilling, and reclamation. A sump will be excavated and used at each drill site to collect used drilling fluids. (SP002011; SP002042; SP001950.) Drilling operations may run continuously up to 24 hours per day, 7 days per week. (SP002010; SP002042; SP001949.) Lights will be used during nighttime operations. (SP002010.) Up to two drill rigs at a time may be used, and up to two holes may be open at a time. (SP002011; SP002042; SP001950.) Up to 12,500 gallons of water per day will be used for drilling. (SP002011; SP002042; SP001950.) Equipment that will be utilized for the project typically produces noise levels as high as 98 dBA at 50 feet from the source. (SP001965.)

Reclamation will occur in two phases. (SP002012; SP002042; SP001950.) The first phase will be ongoing and concurrent with operations, and will involve removing supplies and non-native materials in addition to sealing drill holes. (SP002012; SP002042; SP001950.) The second, final phase of reclamation will involve removing all equipment and materials and restoring disturbed areas. (SP002012; SP002043; SP001950.) Sumps will be allowed to dry before final reclamation. (SP002012; SP001950.) USFS will monitor and assess the progress of reclamation for three years; depending upon the success of reclamation, additional seeding, weed treatment, or installation of erosion control structures may be required. (SP002012; SP002043; SP001950.)

***II. Standard of Review***

The parties agree that summary judgment is appropriate for resolving a challenge to a federal agency's administrative decision when review is based on an administrative record. *See, e.g.*, *Southwest Ctr. for Biological Diversity v. Babbitt*, 980 F. Supp. 1080, 1083 (D. Ariz. 1997). A motion for summary judgment should be granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Judicial review of agency actions under NEPA is governed by the Administrative Procedure Act ("APA"). *California v. Norton*, 311 F.3d 1162, 1170 (9th Cir. 2002); *see*

*also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Pursuant to the APA, "agency decisions shall be set aside if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Norton*, 311 F.3d at 1170 (quoting 5 U.S.C. § 706(2)(A)). This standard of review requires courts "to ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (internal quotation omitted). An agency's decision is arbitrary and capricious if "'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

### III. Analysis[4]

In categorically excluding the Sunnyside Project from detailed environmental analysis under NEPA, USFS concluded that the Project would take less than one year to complete and that no extraordinary circumstances, such as impacts to threatened or endangered species or cumulative impacts from other projects, precluded use of a categorical exclusion. (Doc. 28 at ¶ 8.) Plaintiffs contend that USFS should have performed an Environmental Assessment ("EA") under NEPA to determine the project's anticipated effects on the environment, instead of categorically excluding the project from detailed NEPA analysis. Plaintiffs argue that use of a categorical exclusion to

---

[4] There is no dispute that Plaintiffs have constitutional standing in this case. There is also no dispute that this Court has federal-question jurisdiction under 28 U.S.C. § 1331.

- 4 -

approve the Sunnyside Project was arbitrary and unsupported by the record because (1) the project cannot be completed in one year or less and thus does not qualify for categorical exclusion as a short-term mineral exploration project; (2) extraordinary circumstances precluding the use of a categorical exclusion exist because the project may negatively affect listed species; and (3) USFS failed to properly evaluate the cumulative impacts of the project before determining that use of a categorical exclusion was permissible.

**A. Statutory Framework**

Under NEPA, federal agencies must prepare a detailed written statement known as an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11. Under certain circumstances, an agency must prepare an environmental assessment ("EA") to determine whether preparation of an EIS is necessary. 40 C.F.R. § 1501.4(a)-(c). Certain proposed actions are considered "categorically excluded" from NEPA and do not require preparation of an EIS or an EA. *Id.* § 1508.4. "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

"Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities" are generally appropriate for categorical exclusion unless "extraordinary circumstances related to the proposed action" exist. 36 C.F.R. § 220.6(a), (e)(8). "Extraordinary circumstances are those circumstances 'in which a normally excluded action may have significant environmental effect.'" *Alaska Ctr. for Env't*, 189 F.3d at 858 (quoting 40 C.F.R. § 1508.4). Determining whether a proposed action has "significant" effects requires considering the context and intensity of the proposed action. *See* 40 C.F.R. § 1508.27. For site-specific actions, significance typically depends upon the action's short- and long-term effects in the locale. *Id.* § 1508.27(a). In evaluating the intensity (*i.e.*, severity of impact) of a proposed action,

agencies should consider a variety of factors, including, in relevant part: "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," and the "degree to which the action may adversely affect an endangered or threatened species" or its critical habitat. *Id.* § 1508.27(b)(7), (b)(9). "The mere presence" of listed species or designated critical habitat "does not preclude the use of a categorical exclusion"; rather, the propriety of using a categorical exclusion depends upon "the degree of the potential effect" on such species or habitat. 36 C.F.R. § 220.6(b)(1)(i), (b)(2). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

"Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.4(e)(1). "The scoping process is used to 'determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action.'" *Alaska Ctr. for Env't*, 189 F.3d at 858 (quoting 40 C.F.R. § 1501.7). If, based on scoping, the responsible official determines that "it is uncertain whether [a] proposed action may have a significant effect on the environment," an EA should be prepared. 36 C.F.R. § 220.6(c). If, based on scoping, the responsible official determines "that the proposed action may have a significant environmental effect," an EIS should be prepared. *Id.*

"When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for Env't*, 189 F.3d at 859. If the agency asserts that an activity will have an insignificant effect on the environment, the agency "'must supply a convincing statement of reasons why potential effects are insignificant.'" *Id.* (quoting *The Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985)).

**B. Time-Frame of Project**

In approving the Sunnyside Project, the USFS used the categorical exclusion for short-term (one year or less) mineral investigations pursuant to 36 C.F.R. § 220.6(e)(8).

- 6 -

Plaintiffs argue that USFS's use of the categorical exclusion for short-term mineral investigations was arbitrary and capricious because the record establishes that the Sunnyside Project cannot be completed within one year. The Court agrees. Though USFS's revised Decision Memorandum states that all authorized ground-disturbing activities, including reclamation activities, shall be completed within one year (SP002043), the record does not support USFS's conclusion that completion of authorized project activities within one year will be possible.

To minimize impacts to the Mexican spotted owl and the yellow-billed cuckoo during the species' breeding seasons, there will be a lengthy non-operational period in which project activities must cease. Initially, the non-operational period was anticipated to last from March 1 to August 31, with a six-month window, from September 1 to February 28, during which project activities would occur. (SP000820; SP000837; SP001650, SP001662; SP001795; SP001818.) After the listing of the yellow-billed cuckoo as endangered, the non-operational period was extended through September 30, shortening the project's operating window from six to five months, from October 1 to February 28. (*See* SP001947; SP002047.)

Given the project's limited five-month operating window, all authorized activities must be completed within five months in order for the project to be completed in one year or less. The record indicates that drilling activities alone will take approximately six months to complete. (*See* SP002017 ("activities are anticipated to require approximately two months per drill site (for a total of three bouts of drilling), with several more days for site closure activities (backfilling and sealing of holes, demobilization, etc.)"); SP002024 ("the proposed action will occur 24 hours per day for 2 months at paired drill sites. Three bouts of drilling will thus be required to complete activities at all 6 sites. Additional time will be required for site closure activities."); SP001873 (a "maximum of two months will be spent drilling each hole, and several more days will be required to plug each drill hole and mobilize into and out of each site.").) Before drilling can begin, road maintenance and drill site preparation activities must occur. After drilling is completed, reclamation

activities will require additional time. The most recent Plan of Operations indicates that the project operator anticipated that project activities, including reclamation activities, would require approximately one year and five months. (*See* SP001869.)

Furthermore, the Decision Memorandum specifies that USFS "will monitor and assess the progress of some reclamation activities, including revegetation, invasive species treatments, and erosion control, for a minimum of three years," and that "additional seeding, weed treatment, or installation of erosion control structures" may be required during the monitoring period. (SP002043.) Defendants argue that this three-year monitoring period should not be considered part of the project's duration because all ground-disturbing project activities will be completed before the monitoring period begins; however, the Decision Memorandum anticipates that additional ground-disturbing reclamation activities may be required during the three-year monitoring period.[5]

USFS's determination that the project can be completed in one year or less is unsupported by the record. Therefore, USFS's approval of the project using the categorical exclusion for short-term mineral explorations pursuant to 36 C.F.R. § 220.6(e)(8) was arbitrary and capricious.

**C. Potential Impacts to Listed Species**

Western yellow-billed cuckoos are likely to occur in the project area during their breeding season, but the birds begin a southbound migration in mid-August, with most having dispersed by mid-September. (SP002013; SP002016.) The USFWS found that cessation of project activities from March 1 to September 30 "will reduce the potential for disturbance of nesting western yellow-billed cuckoos to an immeasurably small level." (SP002013.) Project "activities capable of disturbing the species will be

---

[5] USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under NEPA. (Doc. 35 at 4.) However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval.

- 8 -

1  conducted only during the non-breeding season, when individuals of the species are not
2  present." (SP002017.) There is no western yellow-billed cuckoo proposed critical
3  habitat in the project area. (SP002016.)

4  No jaguars are known to inhabit the project area, but the possibility that one may
5  occur in the area cannot be discounted, and the project area contains jaguar critical
6  habitat. (SP002017-18.) The USFWS found that "site traffic, drilling noise, nighttime
7  lighting, and other associated disturbances will cause any jaguars that may be present to
8  avoid the area," but it concluded that "such a relatively minor, short-term, and temporary
9  change of behavior is insignificant when compared to the large area of habitat available
10 to the species in the vicinity." (SP002018.) Accordingly, the USFWS found that "the
11 proposed action is not likely to adversely affect the jaguar." The USFWS also found that
12 "the proposed action is not likely to adversely affect jaguar critical habitat" even though
13 it is likely to harass jaguars' prey base and even though the "level of disturbance may be
14 intense in terms of noise and human activity." (SP002019.) The USFWS based these
15 conclusions on the "small scale" of the project's effects as well as "their brevity and non-
16 permanent nature." (SP002018.)

17 No resident ocelots are known to occur in the project area, but the Patagonia
18 Mountains provide suitable habitat for ocelots and a male ocelot has been detected in the
19 Patagonia Mountains.[6] (SP002020.) The possibility that ocelots could occur in and/or
20 disperse through the project area at any time cannot be discounted. (SP002020.) The
21 USFWS concluded that project activities could cause ocelots to avoid the project area,
22 but anticipated that ocelots "would simply select an adjacent route" without incurring
23 "additional energetic demands, reduced prey availability, or increased predation risk."
24 (SP002021.) USFWS thus found that the proposed action was "not likely to adversely
25 affect the species," basing this conclusion "on the small scale of the effects, as well as
26 their brevity and temporary nature." (SP002021.)

27 Lesser long-nosed bats may forage in the project area through late summer and

---

[6] There is no designated critical habitat for the ocelot. (SP002021.)

- 9 -

early fall, departing in October and November.[7]  (SP002022.)  The primary potential effects of the project on lesser long-nosed bats are nighttime disturbance in October and November and a probable inability to forage on agaves in the area during those months.  (SP002022.)  The proposed action includes a conservation measure requiring that agaves be avoided to the extent practicable, or relocated.  (SP002022.)  The USFWS found that lesser long-nosed bats would likely avoid the project area during project activities, but that such avoidance was unlikely to result in reduced foraging or increased energy expenditures "[g]iven the low density of agaves on site, the great number of agaves located outside of the action area but within the dispersal distance of known roosts, and the relatively brief exposure to effects."  (SP002023.)  The USFWS accordingly concluded that the project "is not likely to adversely affect the lesser long-nosed bat."  (SP002023.)

The project area is located within Mexican spotted owl critical habitat.  (SP002025.)  One Mexican spotted owl Primary Activity Center (an area of ideal nesting/roosting habitat which is afforded higher protection) is located within the project vicinity, with a nesting core area only 0.1 mile southwest of one of the drill sites.  (SP002023.)  The Primary Activity Center has a history of occupancy by breeding pairs of Mexican spotted owls.  (SP002023.)   Mexican spotted owls are territorial, with relatively high fidelity to territories.  (SP002023.)  The Mexican spotted owls' breeding season runs from March 1 to August 31 and "represents a time of increased vulnerability" when disturbance of adult birds can result in reduced prey delivery to fledglings and temporary abandonment of nest sites.  (SP002023.)  Mexican spotted owls will still be present, but not engaged in breeding activities, during the operating period of the project.  (SP002025.)   The March 1 to September 30 non-operational period will avoid disturbance of breeding owls and their offspring.  (SP002026.)  Noise disturbance from the project may affect up to 26% of the Mexican spotted owls' non-breeding season

---

[7] There is no designated critical habitat for lesser long-nosed bats.  (SP002023.)

1  range.[8]  (SP002025-26.)  It "is unclear how nighttime lighting could affect" the Mexican
2  spotted owl.  (SP001964.)   The USFWS found that owls may avoid the project area
3  during project activities but anticipated that "owls will forage in the remaining, and larger
4  area not subject to noise disturbance, rendering the effects of the action unlikely to occur
5  (discountable) and too small to meaningfully measure (insignificant)."  (SP002024-
6  2025.)  The USFWS thus concluded that the project "is not likely to adversely affect the
7  Mexican spotted owl." (SP002025.)

8  Plaintiffs argue that the Sunnyside Project presents extraordinary circumstances
9  precluding use of a categorical exclusion because it may affect listed species.  In
10 *Conservation Congress*, the court found that USFS's decision to apply a categorical
11 exclusion to a proposed action was arbitrary and capricious where the agency found that
12 the action may affect, but was not likely to adversely affect, the northern spotted owl.
13 *Conservation Cong. v. U.S. Forest Serv.*, CIV 2:12-02416 WBS KJN, 2013 WL 2457481,
14 *7-8 (E.D. Cal. June 6, 2013).  The court noted that "an extraordinary circumstance is a
15 circumstance 'in which a normally excluded action *may* have a significant environmental
16 impact.'"  *Id.* at *7 (quoting 40 C.F.R. § 1508.4) (emphasis added in *Conservation
17 Cong.*).  The court recognized that use of a categorical exclusion is appropriate where an
18 agency finds that a proposed action will not negatively impact a listed species, but held
19 that use of a categorical exclusion is not appropriate where the agency merely finds that
20 an action is not likely to negatively affect a listed species.  *Id.* at *8.

21 To the extent that *Conservation Congress* applied a bright-line rule precluding use
22 of a categorical exclusion whenever the USFWS issues a "may affect, but is not likely to
23 adversely affect" finding, the Court rejects *Conservation Congress*'s analysis.[9]  Such a

---

[8] There is a potential discrepancy between the revised BA's and revised letter of concurrence's noise disturbance estimates.  The revised BA estimates that project activities may elicit a flush response in approximately 3.4% of the Protected Activity Center located within 345 feet of a drill site.  (SP001965.)  However, the revised letter of concurrence states that "flush response and decreased foraging ability may occur in 26%" of the Protected Activity Center located within 1,049 feet of a drill site.  (SP002025.)

[9] To the extent that *Conservation Congress* found USFS's "not likely to affect" determination unsupported by the administrative record before the court, the factual

- 11 -

bright-line rule is inconsistent with the regulatory framework and the deference that courts must afford determinations that are based on agency expertise. A biological assessment's determination that a proposed action "may affect" a listed species or critical habitat gives rise to a consultation requirement under Section 7 of the ESA. *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1129 (D. Mont. 2013). The threshold for triggering Section 7 consultation is low. *Id.* at 1129-30. "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character" is sufficient to trigger consultation. *Id.* (internal quotation and alteration omitted). Nothing in the applicable regulations specifies that a "may affect" finding triggering consultation under section 7 of the ESA precludes use of a categorical exclusion under NEPA. The test for determining the propriety of using a categorical exclusion under NEPA is distinct from the test for triggering consultation under Section 7 of the ESA. Use of a categorical exclusion is precluded if a proposed action may have a significant environmental effect. 36 C.F.R. § 220.6(c). Whether a proposed action may have a significant environmental effect is a nuanced determination depending in part upon "the degree to which the action may adversely affect an endangered or threatened species or its critical habitat." 40 C.F.R. § 1508.27(b)(9). The USFS's expertise makes it uniquely qualified to determine whether the degree of potential adverse effects on listed species or critical habitat rises to the level of a potentially significant environmental effect. Where the agency considers the proper factors and provides a reasoned explanation of why potential effects are insignificant, the Court should defer to the agency's expertise in this area. *See Alaska Ctr. for the Env't*, 189 F.3d at 859 ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." (internal quotation omitted)).

Here, USFS and USFWS analyzed the Sunnyside Project's potential effects on

---

similarities between potential effects on the northern spotted owl in *Conservation Congress* and potential effects on the Mexican spotted owl in the present case lend persuasive value to *Conservation Congress*.

- 12 -

listed species and provided reasoned explanations of why the project is not likely to adversely affect such species. However, the administrative record indicates that the effects of the Sunnyside Project's nighttime lighting on the Mexican spotted owl are uncertain, and that negative effects on the owl from project noise can be anticipated in up to 26% of the owl's non-breeding territory. USFS did not provide a convincing explanation of why these potential effects to the Mexican spotted owl are certain to be environmentally insignificant. *See* 36 C.F.R. § 220.6(c) ("If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA."); *see also Alaska Ctr. for Env't*, 189 F.3d at 859 ("The agency must supply a convincing statement of reasons why potential effects are insignificant." (internal quotation omitted)). Furthermore, USFS's determination that the Sunnyside Project will not have significant environmental effects is based in large part upon the anticipated ability of listed species, such as the ocelot and jaguar, to avoid the affected area during project activities. This basis for USFS's determination is undermined by the revised Decision Memorandum's failure to consider the Sunnyside Project's cumulative effects in relation to other temporally and geographically similar mineral exploration projects.

### D. Cumulative Impact Analysis

In determining whether a proposed action has "significant" environmental effects, an agency should consider whether the action is related to other actions with individually insignificant but cumulatively significant impacts. *See* 40 C.F.R. § 1508.27(b)(7); Forest Service Handbook § 1909.15, Ch. 31.3 ("Scoping should . . . reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects."); *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1129 (D. Mont. 2013) (the "extraordinary circumstances analysis includes consideration of whether a normally excluded action may have cumulatively significant environmental effect"); *Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1182 (D. Colo. 2002) ("In determining whether an action requires an EA or EIS or is categorically

excluded, federal agencies must not only review the direct impacts of the action, but also analyze indirect and cumulative impacts."). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. To demonstrate that an agency failed to conduct a sufficient cumulative impact analysis, Plaintiffs need not "show what cumulative impacts would occur" but merely that there is a "potential for cumulative impact." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010).

In its revised Decision Memorandum, USFS concluded that the Sunnyside Project "is expected to produce little or no individual or cumulative environmental effects to either biological or physical components of the human environment." (SP002050.) The revised Decision Memorandum states that the agency's "cumulative effects analysis" for the project "considered effects associated with other past, present, and reasonably foreseeable projects that may overlap in both time (temporal) and space (geographic)" with the effects of the Sunnyside Project. (SP002053.) The Decision Memorandum does not specifically discuss any individual projects except to note that "the Javelina and Margarita exploration projects" had been withdrawn. (*Id.*) The Decision Memorandum then noted that the BA "analyzed cumulative effects and determined no actions would significantly contribute to impacts to Forest Service Sensitive Species." (*Id.*) The revised BA, however, did not analyze the cumulative effects of nearby mineral exploration projects on USFS land, because the cumulative impact analysis of the revised BA was conducted using the ESA's narrower definition of cumulative impact rather than NEPA's definition. The revised BA acknowledges that the definition of cumulative effects used in its analysis "applies only to Section 7 analyses and should not be confused with the broader use of this term in the National Environmental Policy Act." (SP001969.) While the ESA definition of cumulative effects ignores future federal actions (*see* 50 C.F.R. § 402.02), the broader NEPA definition looks to "the incremental impact of the action when added to [all] other past, present, and reasonably foreseeable

future actions." 40 C.F.R. § 1508.7. In relying upon the revised BA's EPA cumulative impact analysis, the revised Decision Memorandum failed to conduct a proper cumulative impact analysis under NEPA. *Cf. Center for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687, 702-03 (D. Ariz. May 27, 2011) (agency's unexplained conclusion that proposed action had no cumulatively significant environmental effects was insufficient to support use of categorical exclusion).

A prior BA for the Sunnyside Project notes that another mineral exploration project, the Hermosa Project, is located approximately 2 miles east of the Sunnyside Project and will have similar effects to jaguars, lesser long-nosed bats, Mexican spotted owls, and ocelots. (SP001667.) USFS concedes that the revised Decision Memorandum failed to analyze the cumulative effects of other nearby mineral exploration projects such as the Hermosa Project, but it argues that the failure is harmless error because the Sunnyside Project will not have any cumulative effects with other projects. (Doc. 32 at 20.)

"In circumstances where an agency errs," a court reviewing the agency's actions under the APA "may evaluate whether such an error was harmless." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004). "In the context of agency review, the role of harmless error is constrained" to situations where "a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached." *Id.* (emphasis in original, internal quotation omitted). USFS argues that noise and light impacts are short-term impacts that cease upon project conclusion, and that there are therefore no cumulative noise and light impacts for projects that do not temporally overlap. (Doc. 35 at 11.) However, in finding that the Sunnyside Project was not likely to adversely affect listed species, USFS and USFWS relied heavily on the project's limited temporal and geographic scope. The record indicates that the Hermosa Project will have similar environmental effects as the Sunnyside Project, meaning the environmental disturbances from the projects will exist over a larger geographical area and a larger temporal timeframe than that analyzed in the

revised Decision Memorandum. Even if the projects will not temporally overlap, USFS has not shown that its failure to analyze the cumulative impact of the Sunnyside and Hermosa projects *clearly* had no bearing on its conclusion that the Sunnyside Project would not have cumulatively significant environmental effects.

Furthermore, USFS has failed to clearly show that the projects will not temporally overlap. At the time the revised Decision Memorandum was issued, the expected implementation date of the Hermosa Project was November 2015. (Doc. 29-2 p. 25.) Therefore, at the time that USFS issued its revised Decision Memorandum, it should have concluded that the Sunnyside and Hermosa Projects would temporally overlap. The argument that the Sunnyside Project and the Hermosa Project will have no cumulative impacts because they will not temporally overlap is a post hoc rationalization unsupported by the information available to USFS at the time it issued its revised Decision Memorandum. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself" rather than on post hoc rationalizations).

### E. Conclusion

Because the record does not support the conclusion that the Sunnyside Project can be completed within one year, USFS's approval of the project using the categorical exclusion for short-term mineral exploration projects under 36 C.F.R. § 220.6(e)(8) was arbitrary and capricious. Furthermore, USFS's conclusion that no extraordinary circumstances preclude use of a categorical exclusion is undermined by USFS's insufficient explanation of why anticipated effects on the Mexican spotted owl are certain to be environmentally insignificant, as well as by USFS's failure to conduct an appropriate cumulative impact analysis. USFS should have prepared an Environmental Assessment. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 29) is **granted** and Defendants' Cross-Motion for Summary Judgment (Doc. 31) is **denied**. USFS's April 8, 2015 revised Decision Memorandum is vacated.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter judgment accordingly and close this case.

Dated this 15th day of September, 2015.

_____
Honorable Rosemary Márquez
United States District Judge